LUTHER T. ROBINSON v. BRANCH MOVING & STORAGE COMPANY, INC.

No. 7515DC676

(Filed 7 January 1976)

**Uniform Commercial Code § 15— purchase of truck — no inspection prior to sale — no implied warranty of fitness**

Where the evidence tended to show that plaintiff executed a lease-purchase contract with defendant for the purchase of a truck, plaintiff insisted on completing the transaction while the truck was being repaired and before he had an opportunity to inspect it, plaintiff purchased the truck "as it was" at the time of sale, and plaintiff thereafter had to have numerous repairs made on the truck, the trial

---

Robinson v. Storage Co.

---

court erred in finding an implied warranty of fitness for a particular purpose and in concluding that the defendant breached that implied warranty.

APPEAL by defendant from *Allen, Judge.* Judgment entered 9 April 1975 in District Court, ORANGE County. Heard in the Court of Appeals 19 November 1975.

On 27 April 1973, plaintiff, then a truck driver employed by defendant, executed a lease-purchase contract with defendant for the purchase of a 1971 Ford truck. In his verified complaint, plaintiff averred that "[d]ue to defects in its mechanical operation, the said truck has proven to be utterly unfit for the use for which it was sold and purchased, and said truck was given back to the defendant by the plaintiff." Plaintiff prayed, *inter alia,* that the trial court award him the $1,400 down payment paid to defendant and $3,000 for repairs and "out-of-pocket" expenses incurred incident to this transaction.

Defendant's answer, denying the material allegations raised in plaintiff's complaint, stated that plaintiff ". . . was [as] familiar with the truck . . . [and] its condition as the defendant was at the time the plaintiff offered to purchase the same from the defendant." Defendant then counterclaimed that

"[a]fter making the down payment on said truck and taking exclusive possession of the same, the plaintiff incurred numerous charges and expenses which were the obligation of the plaintiff but which were wrongfully charged by the plaintiff against the defendant, all of which said charges amount to One Thousand Seven Hundred Sixty-two Dollars and Twenty Cents ($1,762.20)."

Plaintiff denied the allegations raised in defendant's counterclaim and also prayed for "$5,000.00 in lost wages plus 6% interest from June 1, 1973."

At trial, plaintiff testified that he executed the agreement even though defendant ". . . told [him] that it was being repaired in Alabama and that it was supposed to be getting a rebuilt engine." However, plaintiff stated that he had been told by defendant that on balance ". . . the overall condition of the truck was very good."

Plaintiff only had the truck for three days when

". . . the carburetor went out and I had to have it replaced. Mr. Branch paid for it but it was to be deducted

from my salary. Thereafter, on three different occasions I had further trouble with the truck. The engine blew up twice and it caught on fire and I had to have five pistons replaced over a period of three months during the period I had the truck. Also, the transmission went out on the truck.

The last time that I saw the truck was in June or July of 1973. What I mean by the engine blowing up is that the pistons catch on fire and become seized to the cylinder wall. This condition occurred and it interferred with my employment contract in that my truck was down more than it was available. Out of the three months that I owned the truck, it was never on the road more than one week at a time. I was able to complete only three jobs. I probably did not make over $1,000 on the three jobs.

I know that the engine was replaced on two occasions during the three months I had the truck. Once was at Alexander Ford in Durham where it was rebuilt.

I complained to Mr. Branch about the truck the last time it broke down. This was when the transmission went out and I had put it in the shop with Mr. Branch's authorization. The mechanic had been working on it and kept it tied up for four days and on the fifth day when I was supposed to pick it up, it was not ready and I just got fed up and left it in the shop. I just walked away from it after calling Mr. Branch. That was in Georgia.

When I called Mr. Branch, he told me to try to get it fixed and I mentioned to him that I was fed up with the job and asked that he either replace the truck or refund the money. He did not seem to really care what I did one way or the other but he did not offer to refund my money. He said it was too bad about the truck. He said it was impossible to replace the truck at that time."

However, on cross-examination, plaintiff recalled that when he

". . . came in to sign that contract, I knew the truck was under repairs in Alabama. I did not inspect the truck and had no discussions with Mr. Branch about inspecting it. I felt like I was familiar with it having driven it before. I did not feel that I needed to wait and see until repairs were successful. I assumed that the truck would be all

right. Mr. Branch knew basically the same thing about the truck at that time.

I do not remember whether there was any discussion about warranty as the truck was fairly new and therefore, it would have been under warranty, but I was buying it 'as it was' at that time, knowing that it was in Alabama being repaired but assuming that it would be all right and under warranty."

Defendant's president, William Benjamin Branch, testified that when plaintiff tendered the down payment,

"I tried to get him to hold off until the truck got back to Durham so he could inspect it and drive it and see if he was satisfied with it. It was not in town at the time he made that payment. He had driven the truck with us before and was familiar with it but we did not even sign any contract with him at the time he paid us the money. At the time the contract was signed on the 27th day of April, 1973, the truck was still in the shop in Opalika, Alabama. When he came back in to get the contract signed, after we had tried to get him to wait, I told him at that time 'why don't you wait until we get it back in Durham?' and he was a little bit disgusted because it had taken so long. I offered him his money back at that time and he said he didn't want his money back, he wanted his truck and he needed to get back to work. He felt like if he went down to Alabama he could pick up the truck and continue his operations for Mayflower from that standpoint. We made no representations to him at that time concerning the truck because I did not drive the truck. It was in good condition from what the men had told me up to the time it went into the shop. We made no promises concerning warranties on that truck at the time we sold it to him. He signed the contract and left to go on his first job."

Moreover, Mr. Branch noted that at

". . . one period when his truck was down, he did drive as a salaried employee the International truck for us for awhile. During that period I offered him his money back and he said he did not want his money back. He wanted a good truck. We then offered him number 73, the International, and he took it to try it and, unfortunately used it for one trip and he had a bad trip there. In fact,

he abandoned his truck in Virginia. He still wanted number 81—the Ford truck."

Defendant's president believed that the two offers of refund to plaintiff were made

> ". . . out of the goodness of my heart. I offered it to him twice. Once before he ever picked the truck up because he had not even seen it and then I offered it to him back in my office when it was down one time. I had asked him to wait before he got to see the truck and at no time was he forced or told to take this particular truck. He chose this truck and I would have done the same thing."

Mr. Branch finally explained that

> ". . . When we talked about the condition of the truck, Mr. Robinson told me more than I knew about the truck. I told him that the sale was 'as is' although that does not appear in the paper writing anyway."

The trial court found, *inter alia,*

> ". . . that there was an implied warranty of fitness for a particular use or purpose which ran with the said 1971 Ford motor vehicle from the defendant and third-party plaintiff to the plaintiff herein, and the court concludes that the truck described therein was defective as of April 27, 1973, and was at that time unable to perform, and was unfit for the particular purpose or purposes set out in the employment contract and purchase agreement signed by the parties hereto on that date."

From judgment for plaintiff awarding him $1400, plus interest and court costs, defendant appealed.

*Michael D. Levine and John T. Stewart for plaintiff appellee.*

*Bryant, Bryant, Battle & Maxwell, P.A., by James B. Maxwell, for defendant appellant.*

MORRIS, Judge.

Defendant contends that the trial court erred in finding an implied warranty of fitness for a particular purpose and ". . . in concluding that the defendant breached that implied warranty." We agree.

In this case, plaintiff buyer stated that the truck was purchased "as it was" at the time of sale and he must bear the loss. Throughout this transaction the defendant seller diligently and repeatedly advised the plaintiff of the risk he was taking by purchasing the unit without an inspection. There is, of course, some question as to whether an inspection would or could have revealed any defects in the truck, but notwithstanding that issue, we hold that where a buyer insists on closing the sale he should not later be allowed to shift the unfortunate results of his own short-sightedness onto his defendant seller. The Uniform Commercial Code is designed to structure the course of sales transactions efficiently and fairly and foster ". . . greater flexibility[,] . . . [provide] relief from unconscionable provisions and . . . [engender] some degree of protection from the hardship resulting from the failure of conditions which it had been assumed would continue to exist." 1 Anderson, Uniform Commercial Code, § 2-101:3, p. 200 (1970). The Code, however, is not a law which guarantees every buyer and every seller a "good deal."

Under the Uniform Commercial Code ". . . an implied warranty can . . . be excluded or modified by . . . [a] course of performance. . . ." G.S. 25-2-316(3)(c). Though G.S. 25-2-208 does not specifically define "course of performance," the official comment number 4 indicates that course of performance entails more than a ". . . single occasion of conduct. . . ." Moreover, the fact that this exclusion, raised by the parties' course of performance is oral does not vitiate its utility or relevance.

> "In view of the fact that a writing is not desired merely for the sake of having a writing but in order to assure that the buyer is adequately protected against surprise disclaimers, it would seem that a court if faced with the issue of whether a disclaimer had to be in writing, would readily conclude that where the oral waiver was in fact bargained for and was not a surprise term that the buyer is bound by it. In view of the fact that the prime objective of the section of the Code relating to the exclusion or modification of warranties is the prevention of unbargained-for disclaimers, it is probable that if the circumstances are such that the buyer has consciously made an oral waiver of warranties, the court will give effect to such waiver even though it is an oral, but not a written waiver." 1 Anderson, *supra*, § 2-316:21, at 691-692.

Furthermore, "[i]f there is a writing . . . and such a writing does not contain the oral clause relied on by the seller as a waiver or limitation of warranties, a question then arises under U.C.C. § 2-202 as to whether parol evidence is admissible to establish the existence of such an alleged oral term of the contract." *Id.* Under G.S. 25-2-202(a), parol evidence, in this case raised by operation of a course of performance, may be used in order to help explain and supplement this particular lease-purchase agreement. When so supplemented, it is clear that this buyer purchased this truck "as is" and cannot raise an implied warranty claim against his seller.

We need not reach the issue of whether an implied warranty of fitness runs with used goods. Suffice it to say that the defendant seller effectively disclaimed and plaintiff effectively waived whatever warranties may have otherwise existed incident to this transaction.

The trial court apparently deemed it unnecessary, in view of its disposition of the matter, to make findings of fact and conclusions of law with respect to defendant's counterclaim. Our reversal of the trial court's action makes it necessary that facts be found with respect to the counterclaim.

Reversed and remanded.

Chief Judge BROCK and Judge BRITT concur.