**PIONEER/ECLIPSE CORPORATION,**
**Plaintiff,**

v.

**KOHLER CO., INC., Defendant.**

**No. CIV.5:97CV59.**

United States District Court,
W.D. North Carolina,
Statesville Division.

March 22, 2000.

John M. Logsdon, McElwee & McElwee, N. Wilkesboro, NC, for Pioneer/Eclipse Corporation, plaintiffs.

John R. Wester, William W. Toole, Robinson, Bradshaw & Hinson, P. A., Charlotte, NC, for Kohler Co., Inc., defendants.

### MEMORANDUM AND ORDER

THORNBURG, District Judge.

THIS MATTER is before the Court on the Plaintiff's timely filed objections to the

Memorandum and Recommendation of United States Magistrate Judge H. Brent McKnight. Pursuant to standing orders of designation and 28 U.S.C. § 636, the undersigned referred the Defendant's motion for summary judgment and the Plaintiff's motion for partial summary judgment to the Magistrate Judge for a recommendation as to disposition. Having conducted a *de novo* review to those portions of the recommendation to which specific objections were filed, the undersigned grants the Defendant's motion for summary judgment and grants in part and denies in part the Plaintiff's motion for partial summary judgment. 28 U.S.C. § 636(b); Fed. R.Civ.P. 72.

## I. STANDARD OF REVIEW

The parties have cross-moved for summary judgment, with the Plaintiff seeking partial summary judgment. Defendant's motion will be considered first since it is addressed to each of Plaintiff's claims. Summary judgment is appropriate if there is no genuine issue of material fact and judgment for the moving party is warranted as a matter of law. Fed.R.Civ.P. 56(c). A genuine issue exists if a reasonable jury considering the evidence could return a verdict for the nonmoving party, here the Plaintiff. *Shaw v. Stroud,* 13 F.3d 791, 798 (4th Cir.1994) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). Defendant as the moving party has an initial burden to show a lack of evidence to support the Plaintiff's case. *Id.* (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). If this showing is made, the burden then shifts to the Plaintiff who must convince the Court that a triable issue does exist. *Id.* Such an issue will be shown "if the evidence is such that a reasonable jury could return a verdict for the [Plaintiff]." *Id.* A "mere scintilla of evidence" is not sufficient to defeat summary judgment. *Id.* Moreover, when considering the facts of the case for purposes of this motion, the Court will view the pleadings and material presented in the light most favorable to the Plaintiff, as the nonmoving party. *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The same procedure will be used in consideration of the Plaintiff's motion for partial summary judgment.

## II. PROCEDURAL HISTORY

Pioneer/Eclipse Corporation (Pioneer), a North Carolina corporation, brought suit in this Court in 1997 based on diversity jurisdiction. The complaint alleges four causes of action: (1) breach of contract; (2) breach of implied and express warranties; (3) misrepresentation; and (4) violations of North Carolina's Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. §§ 75–1.1, *et. seq.* Kohler Co., Inc. (Kohler), a Wisconsin corporation, answered raising the affirmative defenses of accord and satisfaction, limited warranties, and failure to specifically plead allegations of fraud. Kohler later received permission to amend its answer to assert a counterclaim against Pioneer for conversion. After attempts at mediation proved unsuccessful, Plaintiff moved for partial summary judgment followed quickly by the Defendant's motion for summary judgment. The Magistrate Judge recommended the dismissal all of Plaintiff's claims, but rejected dismissal of Defendant's counterclaim for conversion.

## III. STATEMENT OF FACTS

Pioneer manufactures floor buffers used to polish floors. Until 1989, it used Honda engines in its buffer machines. Deposition of William H. Wilson, *attached to* Plaintiff's Motion for Partial Summary Judgment, filed December 7, 1998 ["Plaintiff's Motion"], at 44.[1] One of Pioneer's con-

---

1. William Wilson was one of the original incorporators of Pioneer and remained with the company until 1996.

813

cerns about the motors used in its machines was the emission of carbon monoxide. *Id.,* at 52–53. Kohler approached Pioneer in 1989 concerning the purchase of its propane engines for the buffer machines. Kohler advised that it had developed an emission control system for use with these machines. *Id.,* at 56–57. Although Pioneer had not requested the design of such a system, Kohler embarked on the design and production thereof as one means of obtaining Pioneer's business. *Id.,* at 59. The Kohler Emission Sentry (Sentry) system was designed to control a variety of emissions in addition to carbon monoxide. *Id.,* at 69.

Even before Pioneer began purchasing the Kohler engines, problems were experienced with the Sentry system. *Id.,* at 89–90. As soon as one problem was solved, another would develop. *Id.,* at 91. The decision to change from Honda to Kohler took from 1989 through 1991. *Id.,* at 94. Despite the problems, "[w]e liked them as individuals and we believed them. And, as I said before, I believe, they believed. It's just in an imperfect world, you cannot have perfect products. Their product wasn't as perfect as they expected, and it definitely wasn't as perfect as we expected. Obviously, it came as a surprise to them as much as it did us .... If they'd have known all this, they'd have never called on us in the first place." *Id.,* at 94–95.

Throughout this time period, the machines were being used by Pioneer's customers as a prototype. In fact, Pioneer agreed to take on the responsibility of testing the prototypes in order to guarantee the success of the Sentry system. *Id.,* at 290–91. Pioneer received many complaints from its customers. *Id.,* at 106. Yet, Pioneer implemented a time line for the change to Kohler and the elimination of all Honda engines. *Id.,* at 108. By April 1993, all engines would be manufactured by Kohler. *Id.,* at 109. In order to implement the conversion, Kohler asked that an advance order be placed for 1,000

engines and in October 1992, Pioneer placed an order for $3.5 million worth of engines using its standard purchase order. *Id.,* at 110–12. Despite the previous complaints from its customers, Pioneer's problems were not with the prototype machines but with the production machines turned out after this initial order. *Id.,* at 291. "[I]f the production equipment operated as well as prototype equipment, we were satisfied, but that's not the case." *Id.*

Although Pioneer manufactures floor buffers, they also sell the products to be used with the buffers. In fact, Pioneer makes as much or more from the sale of those products as from the sale of the buffers. Pioneer's current president, Yoshio Misumi, testified that when Pioneer lost customers due to malfunctions of the buffers, they also lost product sales to those customers. Deposition of Yoshio Misumi, *attached to* Plaintiff's Motion, at 19–20.[2] The Kohler engines were introduced in April 1993 and sales were initially good due to Kohler's reputation. *Id.,* at 21. By 1995, sales were dropping due to the problems and in June of 1996, Kohler decided to withdraw from the market altogether. *Id.,* at 22. Yet, despite the continuing problems with Kohler, as late as December 1995, Pioneer was planning to expand its dealings with Kohler to manufacture a 15 horsepower engine. *Id.,* at 165–66. Mr. Misumi testified that Kohler fulfilled its warranties to the end users of the Pioneer product. Misumi Deposition, *attached to* Plaintiff's Brief in Opposition to Defendant's Motion for Summary Judgment, filed January 11, 1999, at 66. In fact, Mr. Misumi did not believe that Kohler had any intention of causing problems for Pioneer at any time during their relationship. *Id.,* at 74.

When Kohler stopped manufacturing propane engines, Pioneer switched to Briggs & Stratton engines which it continues to use. Misumi Deposition, *attached to* Plaintiff's Motion, at 165–66. These

**2.** Mr. Misumi became president of Pioneer in 1996 and remains in that capacity.

engines do not have an emission control system but do have a monitoring system, called Safe Sense, to detect carbon monoxide. *Id.*, at 23. Safe Sense is manufactured by Pioneer and placed inside the Briggs & Stratton engines. *Id.*, at 23–24. Since the change to Briggs & Stratton engines, Pioneer's sales have progressively increased to the point that in 1998, it had its highest sales to date. *Id.*, at 22. In fact, the market for propane-powered floor buffers is consistently expanding. *Id.*

David Wooten has been the purchasing manager for Pioneer since 1989. He testified that when Pioneer began to do business with Kohler, it was the only company which would provide a warranty running to the consumer. Deposition of David Wooten, *attached to* Plaintiff's Motion, at 22; *accord*, Appendix Exhibit 7, Deposition of Michael N. Wilson, *attached to* Defendant's Motion for Summary Judgment, December 7, 1999 ["Defendant's Motion"], at 112. This was important to Pioneer because otherwise, it would have been liable to the consumer for the engine. Wooten Deposition, *supra*. In fact, in Wooten's opinion, without the warranty, Pioneer would not have selected the Kohler engines. *Id.*, at 23. Thus, when one of Pioneer's customers purchased the Pioneer buffer, Kohler provided the warranty on the engine and Pioneer provided the warranty on everything except the engine. *Id.* Kohler warranted to provide repair and replacement of parts to the end user of the product for two years from the date of purchase. *Id.*, at 50. In Mr. Wooten's experience, "in a lot of cases ... if the engine was over two years old it was taken care of" by Kohler in any event. *Id.* Wooten acknowledged that when a Kohler engine was shipped to Pioneer, it came with a packing slip containing Kohler's terms and conditions. *Id.*, at 41. However, he was not in the habit of reading them. *Id.*, at 40.

Daniel Luhman was an engineer with Kohler from 1987 through 1995. He is currently an account executive with Kohler. Kohler had not had any experience with propane powered engines prior to its relationship with Pioneer. Deposition of Daniel J. Luhman, *attached to* Plaintiff's Motion, at 15. At some time in 1993, Luhman presented a report to the Society of Automotive Engineers concerning the Emission Sentry System developed for Pioneer. *Id.*, at 18–19. The development of the system was described as a cooperative effort between Pioneer and Kohler with testing of the product done by Pioneer. *Id.* Pioneer had field studies performed on the systems as well as laboratory testing. *Id.*, at 21. Pioneer's engineers also made design changes to improve the system.[3] *Id.*, at 22.

Bob Balsdon was the vice-president of sales and marketing at Pioneer from 1990 through 1995. He testified that Pioneer and Kohler entered into a joint venture to develop the Sentry System and as a result, he requested that Pioneer have an exclusive right to sell the product for a time. Appendix II Exhibit 29, Deposition of Robert f. Balsdon, *attached to* Defendant's Response, at _____. Pioneer performed both field testing and in-house testing on the product. *Id.* In a letter written by Mr. Balsdon to Charles Imig of Kohler, he stated that

> in a nutshell, P/E [Pioneer] is interested in CO Management and willing to continue our strong commitment to Kohler. We have demonstrated that commitment for the last two years by working with Kohler to solve several developmental problems. We hope that Kohler will recognize P/E's commitment by allowing

---

**3.** Charles Imig, another Kohler employee, also testified that Kohler and Pioneer mutually developed the Sentry. Appendix II Exhibit 28, Deposition of Charles Imig, *attached to* Defendant's Brief Opposing Plaintiff's Motion for Partial Summary Judgment, filed January 11, 1999 ["Defendant's Response"], at _____. Pioneer provided Kohler with their requirements, Kohler developed a prototype which Pioneer tested in the field and once Pioneer was satisfied, production began. *Id.*

us the two year opportunity to gain full distribution of the Kohler Engines with CO Management.

Appendix Exhibit 5, *attached to* Plaintiff's Motion. Indeed, as late as March 1994, Mr. Balsdon continued to refer to the relationship as "the Kohler–P/E partnership." *Id.,* at Exhibit 89. In a letter that month to Mr. Imig, Balsdon apologized for misinterpretation of test data concerning the muffler and wrote

> As you know, we are experiencing a high rate of ECU [electronic control unit] failures due to "voltage spikes" caused by battery failures and various loose connections. While we realize that your warranty covers materials and workmanship only, we request Kohler's continued warranty support until we can install needed "surge protection" on our machines. We feel this is justified as we asked Kohler to address this issue several months ago and, in our opinion, received slow response. (At the time, I do not believe that Kohler engineers realized the abuse these machines are subject to.)

*Id.* Mr. Balsdon also acknowledged that although the prototype engines worked "flawlessly, subtle changes in the production models brought unexpected problems." *Id.*

After Pioneer's first order, problems developed with the electronic control unit and fuel metering valve. Luhman Deposition, at 52–53. Modifications were made to design and assembly line production but the problem persisted. *Id.,* at 54. Kohler learned that the batteries were cracking on one of the cells causing a voltage surge. *Id.,* at 54–55. This was resolved by additional design modifications. At one point, Pioneer suggested a different battery be used and gave Kohler the name of the supplier. *Id.,* at 64.

Mike Wilson, another Pioneer employee, also testified about the procedures used to deal with the problems experienced with the Kohler engines. Kohler provided Pioneer with forms on which he and other employees were to record in writing any problems with the engines. Wilson Deposition, *attached to* Defendant's Response, at 31. These forms were then sent to Kohler so that the problems could be resolved. *Id.* Examples of those forms from July 1994 through February 1996 show that the primary problems experienced involved the fuel metering value assembly, the electronic control unit and voltage regulator. Appendix II Exhibit 26, *attached to* Defendant's Response. According to Mr. Wilson, Kohler honored every valid warranty claim submitted. Wilson Deposition, *attached to* Defendant's Motion, at 116. "If we had a defective part in the plant, that's the way it was handled. It was run through our warranty department and returned to Kohler for review to see if it was covered under warranty. And if it was, then they would issue the credit." *Id.,* at 163. In honoring its warranties, Kohler made no distinction between engines which came back from the end user and those in which defects were found on Pioneer's assembly line. Wilson could not recall any incident in which Pioneer suggested that Kohler reimburse it for consequential damages. *Id.,* at 170.

Pioneer continued to place orders from Kohler until Kohler determined to stop manufacture of the engines in the summer of 1996. Beginning in August 1994, Pioneer submitted numerous Warranty Claim forms to Kohler in connection with these problems. Appendix II Exhibit 27, Warranty Reports, *attached to* Defendant's Response. In response, Kohler reimbursed Pioneer by checks for labor, repair and replacement. *Id.* This continued until October 1996 when the last check was sent to Pioneer. *Id.*

Pioneer's purchase orders contained the following language:

2. PURCHASE ORDER CONSTITUTES ENTIRE AGREEMENT:

> (a) This Purchase Order, including the "Terms and Conditions" on the face and reverse side hereof ... will be

deemed by the Seller and by Pioneer [ ] ("Buyer") as the final expression of their agreement and will be deemed the exclusive statement of the terms hereof, except that merchandise shall conform to all affirmations of fact or promise made to Buyer and to any descriptions, specifications, samples or models shown to Buyer or made available to Seller by Buyer, whether or not contained or referred to herein. . . .

(b) Acceptance of this Purchase Order is limited to the "Terms and Conditions" contained herein and on the reverse side thereof and no additional terms or conditions shall become part of any contract resulting from this Purchase Order or from the shipment of merchandise in accordance or substantially in accordance with this Purchase Order. . . . [N]o other agreement quotation, or sales note in any way modifying any of said terms and conditions will be binding upon Buyer, unless made in writing and signed by Buyer's authorized representative. . . . In case of conflict between the terms and conditions of this Purchase Order and any terms or conditions on or in any confirmation, acknowledgment, sale or invoice form of Seller, . . . the terms and conditions of this Agreement shall control.

3. QUALITY:

In addition to any other warranties, expressed or implied, Seller expressly warrants that the merchandise shall be merchantable, of the highest quality and free of defects of material and workmanship, and said warranty shall extend to Buyer . . . .

Appendix Exhibit 11, *attached to* Plaintiff's Motion.

Kohler's shipping orders contained the following:

Kohler's acceptance of your purchase order is expressly made conditional on your assent to Kohler's terms and conditions of sale set forth on the reverse side hereof.

.  .  .  .  .

Your assent to the terms and conditions of sale set forth below and on the reverse side hereof shall be conclusively presumed from your failure seasonably to object in writing and from your acceptance of all or any part of the goods ordered. All proposals, negotiations, representations, and purchase orders, if any, regarding this transaction made prior to the date hereof are merged herein.

.  .  .  .  .

BUYER'S REMEDIES—If the goods furnished to the Buyer shall fail to conform to this contract or to any express or implied warranty, Kohler shall replace such non-conforming goods at the original destination and shall furnish instructions for their disposition provided Kohler is notified of such non-conformity or defect within 60 days of shipment. The Buyer's exclusive and sole remedy on account or in respect of any breach of this contract, or to any express or implied warranty, shall be to secure replacement thereof as aforesaid. Kohler shall not in any event be liable for the cost of any labor expended on any such goods or for any special, direct, indirect, incidental or consequential damages to anyone by reason of any breach of this contract or of any express or implied warranty.

WARRANTY—Kohler's standard warranty in effect at the time of shipment shall apply to all goods. Buyer covenants and agrees that . . . all warranties, . . . manuals supplied with the goods or by Kohler will be passed on to the ultimate user. The warranty supplied with the goods is Kohler's sole and exclusive warranty. THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR PURPOSE ARE EXCLUDED FROM THIS CONTRACT.

.  .  .  .  .

UCC—Except as expressly provided herein, this contract is subject to all the provisions of the Uniform Commercial Code of Wisconsin without variation, exclusion or limitation.

Defendant's Deposition Exhibit 8, *included in* Appendix *attached to* Plaintiff's Motion.

The owner's manual for the Kohler engines contained a warranty running to the original consumer for a period of two years from the date of purchase that the engine would be "free from manufacturing defects in materials or workmanship in normal service." Appendix Exhibit 2, Kohler Engines Owner's Manual, *attached to* Defendant's Motion. The warranty was limited to replacement or repair of defective parts and any implied warranties of merchantability or fitness for a particular purpose were limited to the two year period as well. *Id.* The warranty provided that Kohler would not "be liable for special, indirect, incidental, or consequential damages of any kind, including but not limited to labor costs or transportation charges in connection with the repair or replacement of defective parts." *Id.*

## IV. DISCUSSION

### B. Choice of law.

The first issue is whether the choice of law provision in Kohler's shipping statements require the application of Wisconsin law. In making this determination, North Carolina's choice of law provisions are applied because it is the forum state. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). In North Carolina, " 'where parties to a contract have agreed that a given jurisdiction's substantive law shall govern the interpretation of the contract, such a contractual provision will be given effect.' " *Bueltel v. Lumber Mut. Ins. Co.*, 134 N.C.App. 626, 518 S.E.2d 205, 209 (1999) (quoting *Tanglewood Land Co., Inc. v.*

*Byrd,* 299 N.C. 260, 262, 261 S.E.2d 655, 656 (1980)). Therefore, the first issue is whether the parties agreed to such a provision.

▇ The parties agree the Uniform Commercial Code applies to their relationship.[4] Each of Pioneer's purchase orders provided that it constituted the entire agreement between the parties and prohibited a contract on any other terms. Each of Kohler's shipping statements sent with the engines provided not only additional terms and disclaimers but also required Pioneer to formally object to those terms in the absence of which assent was presumed. No objections were made, but both parties went about their business over a period of years as if they had a series of contractual relationships. In this situation, § 2–207(3) provides:

> Conduct by both parties which recognizes the existence of a contract is sufficient to establish a contract for sale although the writings of the parties do not otherwise establish a contract. In such case the terms of the particular contract consist of those terms on which the writings of the parties agree, together with any supplementary terms incorporated under any other provisions of this chapter.

N.C. Gen.Stat. § 25–2–207(3). "Section 2–207(3) is only applicable when the writings of the parties do not otherwise establish a contract yet their conduct evidences a contract." 1 White & Summers, *Uniform Commercial Code,* § 1–3 at 24 (4th ed.1995). The dispute here is essentially "a battle of the forms" which is "purely a question of law." *Ionics, Inc. v. Elmwood Sensors, Inc.,* 110 F.3d 184, 187 (1st Cir. 1997). Thus, as a matter of law, the undersigned finds the parties did not agree on a choice of law provision and under North Carolina law, that provision may not be enforced. *Regent Lighting Corp. v. CMT Corp.,* 32 UCC Rep. Serv.2d 427,

4. The pertinent provisions of Wisconsin's Uniform Commercial Code are virtually identical to North Carolina's version thereof.

818

1997 WL 441297 (M.D.N.C.1997); *Dassault Falcon Jet Corp. v. Oberflex, Inc.,* 909 F.Supp. 345, 351–54 (M.D.N.C.1995). Therefore, North Carolina law applies.[5] *Id.*

## B. Defendant's motion for summary judgment.

### 1. The terms of the contract between the parties.

■ Pioneer and Kohler had a relationship beginning in 1989 which continued until the summer of 1996. During that period, numerous orders were placed for the manufacture and delivery of engines. And, numerous shipments were received containing Kohler's shipping statements. The parties do not dispute that their course of dealing resulted in a series of contractual relationships. *See, e.g., Southeastern Adhesives Co. v. Funder America, Inc.,* 89 N.C.App. 438, 442, 366 S.E.2d 505, 507 (1988). Pioneer argues that the "issue is whether Pioneer accepted the end-user limited warranty as part of its contract with Kohler, thereby limiting the express and implied warranties otherwise provided under the UCC and limiting Pioneer's available remedies." Plaintiff's Objections to Magistrate Judge's Proposed Findings and Recommendation, filed May 3, 1999 ["Plaintiff's Objections"], at 10. Kohler claims the parties' course of dealing established that Pioneer did accept these limitations.

It is a mistake to think of 2–207 as a law dealing principally with contract formation. Parties to sales much more often call on courts to use 2–207 to decide the terms of their contract after they exchange documents, perform, or start to perform and then fall into dispute. Here the courts are not deciding whether there is a contract. They are answering a different question: What are its terms?

White & Summers, *supra,* at 9. Section 2–207(3) provides that the terms "consist of those terms on which the writings of the parties agree, together with any supplementary terms incorporated under any other provisions of this chapter." Pioneer's purchase order contained a warranty of merchantability running to it as the Buyer. Kohler's shipping statements provided the only remedy to Pioneer was replacement within 60 days of delivery. "Kohler shall not in any event be liable for … any special, direct, indirect, incidental or consequential damages to anyone by reason of any breach of this contract or of any express or implied warranty." Defendant's Deposition Exhibit 8, *supra.* And, each shipping statement contained an exclusion of all warranties except those of merchantability and fitness running to the ultimate consumer for a two year period beyond the date of purchase. Even those warranties were limited to repair and replacement. Pioneer concurs that such a warranty existed.

Over 3,200 claims were filed for defective Kohler components. Two hundred eighty-three of these claims were component failures found on Pioneer's assembly line before shipment. Pioneer was the authorized service representative of Kohler, and as such, undertook the obligation for making warranty repairs when they were submitted by the original consumer. The Kohler two-year limited warranty was for the benefit of the original consumer and Pioneer was acting on behalf of Kohler in making the warranty repairs for original consumers under the two-year limited warranty. The Kohler two-year warranty required the purchaser to, "bring the engine to an authorized Kohler service facility." Pioneer was such a facility. Pioneer made repairs under the two-year limited warranty on behalf of Kohler and then submitted claims for reimbursement to Kohler.

---

5. However, it must be noted that there is a paucity of law on the issues involved herein both in North Carolina and the Fourth Circuit. This has necessitated drawing on the law of other Circuits.

Plaintiff's Objections, at 11. And, Pioneer acknowledges the receipt of over $500,000 in connection with those claims. Neither party disputes that Kohler honored every valid warranty claim submitted regardless of whether the engine was found to be defective on Pioneer's assembly line or in the hands of the end user. However, Pioneer claims that in addition to that warranty, a warranty ran to it as the Buyer pursuant to which it is entitled to consequential damages. "Pioneer's claim relates only to consequential damages resulting from [Emissions Monitoring Systems] failures."[6] *Id.*, at 7.

The Uniform Commercial Code also speaks to this situation.

> (1) Where the contract for sale involves repeated occasions for performance by either party with knowledge of the nature of the performance and opportunity for objection to it by the other, any course of performance accepted or acquiesced in without objection shall be relevant to determine the meaning of the agreement.
>
> (2) The express terms of the agreement and any such course of performance, as well as any course of dealing and usage of trade, shall be construed whenever reasonable as consistent with each other; but when such construction is unreasonable, express terms terms shall control course of performance and course of performance shall control both course of dealing and usage of trade.
>
> (3) Subject to the provisions of the next section on modification and waiver, such course of performance shall be relevant to show a waiver or modification of any term inconsistent with such course of performance.

N.C. Gen.Stat. § 25-2-208. This section of the Code "can operate to fill gaps in agreements or to interpret agreements ...." White & Summers, *supra*, § 1-6 at 46. "[C]ourse of performance is relevant under [this section] to determine the 'meaning of the agreement' in the first place. When the section is so used, the apparent inconsistency between an express term and course of performance can melt away. After all, the very theory of course of performance, ... is that '[t]he parties themselves know best what they have meant by their words of agreement and their action under that agreement is the best indication of what the meaning was.' " *Id.*, at 47 (quotations omitted).

Pioneer's purchasing manager testified the only reason Pioneer chose Kohler for the manufacture of the engines was the two year warranty running to the consumer. He also testified that Kohler stood by that warranty, often replacing parts although the two year period had passed. Moreover, he testified that Kohler replaced defective parts found in Pioneer's assembly line under the same warranty. And, he admitted that the shipments came with packing slips but acknowledged he did not read them.

Pioneer's current president also testified that Kohler fulfilled its warranties to the end users of Pioneer's product. Moreover, Pioneer was actively involved in the design of the engines, continuing to suggest design modifications. Kohler provided forms on which Pioneer assembly workers made written notations of problems. Yet, there is neither testimonial nor documentary evidence that Pioneer ever demanded Kohler honor any warranty other than the one it indisputably did honor. In a letter written in March 1994, Balsdon, Pioneer's vice-president, acknowledged "we realize that your warranty covers materials and work-

---

**6.** Pioneer also argues it is a jury question whether the payments made by Kohler were for defective engines delivered to Pioneer or to the ultimate end user of the product. Pioneer also argues the Magistrate Judge failed to identify under which warranty payments were made to it by Kohler. However, Pioneer admits it received payment for every defective part or engine submitted to Kohler pursuant to these warranties. Thus, there is no issue for the jury since there is no dispute concerning the honoring of the warranty.

manship only. . . ." [7] None of the correspondence between the parties contains any mention of claims for consequential damages. To the contrary, Pioneer negotiated for and received an exclusive two year distributorship for the engines in consideration of its "mutual partnership."

> In a nutshell, P/E [Pioneer] is interested in CO Management and willing to continue our strong commitment to Kohler. We demonstrated that commitment for the last two years by working with Kohler to solve several developmental problems. We hope that Kohler will recognize P/E's commitment by allowing us the two year opportunity to gain full distribution of the Kohler engines with CO Management.

Appendix Exhibit 5, *supra.* Contrary to demanding reimbursement for consequential damages, Pioneer acknowledged the limits of the warranty and sought an exclusive right to distribute the machine as "payment" for its position in the mutual partnership. And, beginning in August 1994, Pioneer submitted Warranty Claim Forms for defective parts and engines to Kohler which, Pioneer acknowledges, paid it for replacements, parts and labor. Nothing more was ever sought by Pioneer. Under these facts, Kohler has met its initial burden to show there is no factual issue concerning the parties course of dealings; Pioneer sought reimbursement for the defective parts and received it. This occurred over and over again for a period of years. *New Moon Shipping Co., Ltd. v. MAN B & W Diesel AG,* 121 F.3d 24, 31 (2nd Cir.1997) ("A course of dealings analysis does require, of course, an indication of the common knowledge and understanding of the parties. That understanding may be inferred from the resolution of a prior dispute between the parties or from tacit acceptance of a clause repeatedly sent to the offeree in an order confirmation documents.").

Thus, the issue is whether Pioneer has forecast evidence sufficient to withstand summary judgment showing that, in the parties' course of dealing, Pioneer did not accept Kohler's exclusion of all warranties except those honored; *i.e.,* the exclusion of consequential damages. Pioneer argues this is an issue for the jury; however, this overlooks Rule 56's direction that

> [w]hen a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

Fed.R.Civ.P. 56(e).

Pioneer has presented no evidence that it ever expected consequential damages, made claims therefor, or alerted Kohler that it considered itself entitled thereto. Indeed,

> [Pioneer] has failed to contest or refute any material factual issue concerning the extent or nature of its prior course of dealing with [Kohler]. . . . [Pioneer] does not contest the facts that it had done business with [Kohler] since at least [1989] and had engaged in "hundreds of transactions" with [Kohler] during that time. Neither does [Pioneer] dispute that each invoice it received from [Kohler] (and paid) contained the same term [excluding liability for consequential damages]. The only item that [Pioneer] offers in opposition to [Kohler's] motion is the [testimony] of [Wooten] that [he] . . . was [un]aware of . . . [the] limitation. Giving full credit to this claim as we must on [Kohler's] motion for sum-

---

**7.** Pioneer claims any testimony from Bob Balsdon is tainted by his motivation for revenge against the company. However, it is unnecessary to consider Balsdon's testimony since written documents from the time period at issue clearly show the parties' relationship and their understanding thereof.

mary judgment, ... standing alone, [this] is insufficient to create a genuine factual dispute over whether a course of dealing as to a ... limitation existed between [Kohler] and [Pioneer].

*Capitol Converting Equip., Inc. v. LEP Transport, Inc.,* 965 F.2d 391, 395 (7th Cir.1992); *accord Ramsey Products Corp. v. Morbark Indust., Inc.,* 823 F.2d 798 (4th Cir.1987); *Robinson v. Branch Moving & Storage Co., Inc.,* 28 N.C.App. 244, 221 S.E.2d 81 (1976).

The undersigned finds, as a matter of law, that the parties written documents did not establish a contract but that their course of dealing shows a series of contractual relationships over a period of years. Pioneer admits Kohler provided a warranty to the end user of the product and admits Kohler supplied the same warranty to it in connection with defective products found on its assembly line. Pioneer has brought forth no evidence to contradict the Defendant's showing that the course of dealing between the parties established the exclusion of any other warranties, whether provided by their course of dealing or the Uniform Commercial Code. Pioneer has failed to make even a *prima facie* showing that consequential damages were not excluded from any warranty running to it from Kohler. As a result, it is unnecessary to reach that portion of the Memorandum and Recommendation discussing whether such damages are speculative.

## 2. The Magistrate Judge's recommendation concerning Pioneer's remaining causes of action.

Pioneer has not objected to the recommendations that its claims for misrepresentation and unfair trade practices be dismissed. This is not surprising since Pioneer's top executives testified that Kohler never misrepresented anything to them. Thus, the case devolves into a breach of contract claim pursuant to which

no cause of action lies under North Carolina's Unfair and Deceptive Trade Practices Act. *Jones v. Capitol Broadcasting Company, Inc.,* 128 N.C.App. 271, 495 S.E.2d 172 (1998). Having reviewed the Magistrate Judge's proposed findings and recommendations, the undersigned concurs with his conclusions.

## C. Plaintiff's motion for partial summary judgment.

The discussion *supra* explains why Pioneer's motion for partial summary judgment must be denied as to its claims for breach of contract and warranties, both express and implied. Pioneer also sought a finding that there was no partnership or joint venture between the parties. That request is also denied since undisputed evidence from Pioneer's own employees shows the companies agreed to a joint collaboration concerning the emission control system.

Pioneer also moved for summary judgment against Kohler's counterclaim for conversion. Although the record shows Kohler's motion to amend its answer to add a counterclaim was granted, there is no such amended answer and counterclaim in the record before the undersigned.[8] This alone is grounds for dismissing the counterclaim. However, it appears that Pioneer has substantive grounds for dismissal as well.

According to the parties' briefs, Kohler claims it honored warranties for engines which malfunctioned due to defective or inadequate batteries. Kohler argues these claims should not have been honored because Pioneer selected the batteries at issue but Kohler was unaware of this fact until discovery in this litigation. However, in March 1994, Pioneer's vice-president wrote Kohler's Imig about this issue, acknowledging battery failures. A Kohler employee testified that during the time period at issue, Pioneer suggested the use

---

8. The motion for leave to amend contains a recitation that the proposed amendment is attached. The motion in the record does not contain an attachment. Nor was the amended answer separately filed after leave was granted.

of a different battery and provided the name. And, the witnesses acknowledged the mutual collaboration during the development of the engines. Kohler and Pioneer collaborated in the development and modifications to the product and Kohler's employees determined to use the battery suggested by Pioneer in an effort to control the "voltage spikes" being experienced with the engines. Conversion is the unauthorized exercise of ownership over property belonging to another. *Nelson v. Chin Yung Chang,* 78 N.C.App. 471, 337 S.E.2d 650 (1985). Honoring a warranty for a mutually developed product simply does not fall within these elements. Pioneer's motion for summary judgment is therefore granted.

### V. ORDER

**IT IS, THEREFORE, ORDERED** that the Defendant's motion for summary judgment is hereby **GRANTED**; and

**IT IS FURTHER ORDERED** that the Plaintiff's motion for partial summary judgment is hereby **GRANTED IN PART AND DENIED IN PART** and the Defendant's counterclaim for conversion is hereby **DISMISSED**.

A Judgment dismissing this action in its entirety is filed herewith.

### *JUDGMENT*

For the reasons set forth in the Memorandum and Order filed herewith,

**IT IS, THEREFORE, ORDERED, ADJUDGED AND DECREED** that the Defendant's motion for summary judgment is **ALLOWED**; the Plaintiff's motion for partial summary judgment is **ALLOWED IN PART AND DENIED IN PART**; and the Defendant's counterclaim for conversion is hereby **DISMISSED**.

**IT IS FURTHER ORDERED, ADJUDGED AND DECREED** that this matter be, and the same is hereby, **DISMISSED WITH PREJUDICE** in its entirety.